UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BOLLINGER SHIPYARDS LOCKPORT LLC | CIVIL ACTION |
| VERSUS | NO: 08-4578 |
| NORTHROP GRUMMAN SHIP SYSTEMS, INC. | SECTION: R |

**ORDER AND REASONS**

Before the Court are (1) plaintiff Bollinger Shipyards Lockport LLC's Motion to Compel Arbitration and to Stay Proceedings; (2) defendant Northrop Grumman Ship Systems, Inc.'s Motion to Stay Arbitration; (3) Northrop Grumman Ship Systems's Motion to Dismiss Counts I-II of the Complaint; and (4) Northrop Grumman Ship Systems's Motion to Dismiss Counts III-VIII of the Complaint. For the following reasons, the Court GRANTS Bollinger's Motion to Compel Arbitration, DENIES Northrop Grumman Ship Systems's Motion to Stay Arbitration, DENIES WITHOUT PREJUDICE Northrop Grumman Ship Systems's Motion to Dismiss Counts I-II of the Complaint and Motion to Dismiss Counts III-VIII of the Complaint, and STAYS the action pending arbitration.

I.  **BACKGROUND**

The present dispute has its origins in the United States

Coast Guard's decision in the 1990s to improve its ability to conduct missions in maritime areas far from shore. The resulting "Deepwater Program" envisioned a wide range of upgrades and additions to the Coast Guard fleet. After considering various proposals from defense contractors, the Coast Guard awarded the prime contract under the Deepwater Program to Integrated Coast Guard Systems ("ICGS"), a joint venture between Lockheed Martin Corporation and defendant Northrop Grumman Ship Systems, Inc. ("NGSS"). ICGS, in turn, contracted with NGSS for most of its ship design, upgrade, and modification needs. Finally, NGSS contracted with plaintiff Bollinger Shipyards Lockport LLC[1] ("Bollinger") to perform "conversion work" on the Coast Guard's 110 foot Island Class vessels. (*See* Compl., R. Doc. 1 at ¶ 3.)

The parties disagree about the substance of this last agreement between NGSS and Bollinger. Bollinger claims that the parties understood that Bollinger would be responsible for the "construction, repair, and upgrade of <u>all</u> boats equal to or less than 200 feet." (Compl., R. Doc. 1 at ¶ 8.) At the time the parties were preparing their bid, the Coast Guard had 49 vessels that fit this description. (*See id.* at ¶ 9.) NGSS, in contrast, claims that it made no firm representations about the volume of

---

[1] NGSS actually contracted with a different entity, Halter Bollinger Joint Venture LLC, which then assigned all of its rights and obligations to Bollinger. (*See* Compl., R. Doc. 1 at ¶ 3.)

work Bollinger would get. According to NGSS, the Coast Guard, which had an "indefinite delivery, indefinite quantity" contract with ICGS, would ultimately decide how much work to assign to its contractors.

Whatever the case, Bollinger began converting the 110 foot vessels pursuant to individual subcontracts in 2002. It continued to do so in accordance with a delivery schedule worked out between the parties until July 18, 2005, at which point NGSS notified Bollinger to stop its work. (*See id.* at ¶¶ 19-20.) NGSS claims that the Coast Guard was dissatisfied with Bollinger's work and directed the parties to cease their conversion work. At that point, Bollinger had already delivered six boats and had begun work on six additional boats. (*Id.* at ¶ 20.)

On July 18, 2006, Bollinger sent NGSS a "Termination for Convenience Settlement Proposal," in which it sought to recover $15.6 million (later reduced to $12 million) in actual costs it had incurred as a result of the premature termination. (*Id.* at ¶ 22.) NGSS rejected the Termination Proposal on October 8, 2007. (*Id.* at ¶ 24.) Bollinger now seeks to compel NGSS to arbitrate the claim. (*See id.* at ¶¶ 33-39.) In the event that the Court declines to compel arbitration, Bollinger seeks to recover damages for breach of contract, quantum meruit, unjust enrichment, violation of the New York Prompt Pay Act, and

attorney's fees.  (*See id.* at ¶¶ 40-73.)

Bollinger has filed a motion to compel arbitration and to stay the proceedings in this Court pending arbitration.  NGSS has filed a motion to stay arbitration, a motion to dismiss Counts I-II (which seek to compel arbitration), and a motion to dismiss Counts III-VIII (which seek damages for the underlying claim).  The Court heard oral argument on December 10, 2009, and now rules as follows.

**II. SUBJECT MATTER JURISDICTION**

In its Motion to Dismiss Counts III-VIII, NGSS argues that the Court lacks subject matter jurisdiction over this action.  Because the issue of subject matter jurisdiction must be resolved before the Court may pass on the validity and scope of the arbitration clause, *see Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 127 S. Ct. 1184, 1191 (2007) ("[J]urisdictional questions ordinarily must precede merits determinations in dispositional order."), the Court turns to that question first.

As an initial matter, the Court notes that neither party disputes that the requirements of the general diversity jurisdiction statute, 28 U.S.C. § 1332(a), are met.  The parties are citizens of different states and the amount in controversy is in excess of $75,000.  (*See* Compl., R. Doc. 1 at ¶ (c).)  There

has been no suggestion that the diversity statute does not apply to this case.

Rather, NGSS argues that the dispute is covered by the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601-613, and that the statutory prerequisites for exercising jurisdiction under the CDA have not been met. In particular, NGSS argues that contractors may not seek judicial review of their claims under the CDA until they have first submitted those claims to the "contracting officer" and obtained a final decision. *See* 41 U.S.C. §§ 605, 609(a)(1). Because Bollinger has not exhausted its administrative remedies, NGSS argues, this Court lacks jurisdiction over the contract dispute.

NGSS's argument suffers from a number of flaws. Of these, the most serious is that the CDA does not apply of its own force to the present dispute. By its plain terms, the CDA applies only to procurement contracts "entered into by an executive agency." 41 U.S.C. § 602(a); *see United Kingdom Ministry of Defence v. Trimble Navigation Ltd.*, 422 F.3d 165, 166 (4th Cir. 2005) (CDA's "reach is limited to claims by the Government against a contractor, or by a contractor against the Government"). NGSS and Bollinger are the only parties to the contract in question, and neither qualifies as an "executive agency" as that term is used in the CDA. *See* 41 U.S.C. § 601(2) (defining "executive agency" to mean an executive department, an independent agency, a

military department, or a wholly owned government corporation). Consequently, any statutory exhaustion requirement in the CDA does not directly apply to the present dispute.

NGSS attempts to avoid this conclusion by arguing that the parties incorporated the terms of the CDA into their agreement in paragraph eighteen. (*See* R. Doc. 15-22 at 12.) This appears to be true, *see infra*, but it does not affect the Court's jurisdiction. The lower federal courts' jurisdiction is a product of statute, and the parties cannot by agreement "oust" a district court of its statutorily conferred jurisdiction. *See Home Ins. Co. of New York v. Morse*, 87 U.S. 445, 451 (1874). If the parties have indeed incorporated an exhaustion requirement into their contract, the enforcement of that provision is properly considered as part of the merits inquiry. *Cf. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972) ("No one seriously contends in this case that the forum-selection clause 'ousted' the District Court of jurisdiction ... . The threshold question is whether that court should have exercised its jurisdiction to do more than ... specifically enforc[e] the forum clause.").

## III. ARBITRABILITY

The contract at issue sets up a specialized dispute resolution procedure for "claim[s] for additional costs

associated with [the] late delivery of information or equipment by [NGSS], ICGS, or Lockheed Martin." (R. Doc. 15-22 at 5.) This procedure includes an arbitration option, which Bollinger argues applies to the current dispute. The provision reads in its entirety:

> 6. DELIVERY
>
> (a) Time is of the essence in the performance of this Order. [Bollinger][2] agrees that it shall at its expense, exert every reasonable effort necessary to meet delivery dates for any deliverable items specified under this ORDER. [Bollinger] agrees to notify [NGSS] immediately if, at any time, it appears that the delivery schedule set forth herein may not be met. Such notifications shall include the reasons for any possible delays, steps being taken to remedy any such problems, and a proposed revised delivery date. Further, this notification shall be in addition to any reporting requirements specified elsewhere in this Order. The requirement for notification set forth above is not to be construed as a waiver of the delivery set forth in this Order and shall not prejudice [NGSS]'s or [Bollinger]'s rights under any other clause of this contract or at law. In the event [Bollinger] does not deliver acceptable items in accordance with the delivery schedule set forth herein, [Bollinger] shall be liable to [NGSS] for actual damages assessed by the U.S. Government and incurred by [NGSS] excluding any reduction in award fee suffered by [NGSS]. [Bollinger] shall not be responsible for damages assessed to [NGSS] that are due to the failure by [NGSS] to provide timely delivery of information or equipment.
>
> [NGSS] shall not be responsible for delay or disruption costs incurred by [Bollinger] if the delay is deemed to be concurrent with delay that is in whole or in part due to the actions of [Bollinger].

---

[2] For ease of reading, the Court has substituted "Bollinger" for "SELLER" and "NGSS" for "BUYER."

> [Bollinger] represents that, in the event that it determines that it has been financially impacted by the late delivery of information or equipment by [NGSS], ICGS, or Lockheed Martin for the period of performance of this purchase order, it may submit a claim for additional costs associated with this late delivery of information or equipment by [NGSS], ICGS, or Lockheed Martin. In such event, [NGSS] agrees to submit this claim to its customer, [ICGS], who will render a determination as to the propriety of the claim and the amount due [Bollinger], if any.
>
> If the decision of ICGS finds [NGSS] to be responsible for the late delivery of information or equipment, and therefore, the cause of [Bollinger]'s claim, [Bollinger] agrees that it will not seek to recover from [NGSS] any amount that [NGSS] does not recover from [ICGS]; provided, however, that such late delivery of information or equipment is the result of negligence on the part of [NGSS]. This waiver shall not apply in the event [NGSS] acts intentionally or willfully in the late delivery of information or equipment.
>
> *In the event [Bollinger] disagrees with the decision of ICGS, [Bollinger] may opt to have the claim finally resolved by arbitration under the Commercial Arbitration Rules of the American Arbitration Association.* Arbitration proceedings shall be conducted by a sole arbitrator in New Orleans, Louisiana or such other locale as the parties may agree at the time. If [Bollinger] so requests in the initial demand for arbitration or in the initial response thereto, the parties shall first attempt to resolve the dispute by mediation under AAA's Commercial Mediation Rules. Judgment on the award of the arbitrator may be entered in any court of competent jurisdiction.

[Bollinger] shall report each order problem immediately after [Bollinger] identifies such order problem and shall set forth the following based on the best and most complete information then known or available to the Contractor:

(i)   The nature of the order problem;

-8-

        (ii)        The date on which the order problem arose and the date on which the order problem was identified as such;

        (iii)       The anticipated direct and consequential effects of the order problem upon the delivery schedule or completion of order performance or the cost of the performance of the order;

        (iv)       Identification of the supplies and/or services which are or may be affected; and

        (v)        The Contractor's recommended solution to the reported order problem.

  (b)    [Bollinger] shall not, without [NGSS]'s prior written consent, manufacture or procure materials in advance of [Bollinger]'s normal flow time or deliver in advance of schedule. In the event of termination/cancellation or change, no claim will be allowed for any such manufacture or procurement in advance of such normal flow time unless there has been such prior written consent from [NGSS].

(R. Doc. 15-22 at 5 (emphasis added).)

In addition to arguing that this provision requires the parties to submit their underlying dispute to arbitration, Bollinger raises a threshold argument regarding who should decide the issue of arbitrability. According to Bollinger, the arbitrator, not the Court, should determine the scope of the arbitration clause in the first instance.

The Supreme Court addressed this threshold question in *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995). According to the Court, "the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options*, 514 U.S. at 943 (emphasis in

original). In determining what the parties agreed, applicable state law--in this case, Mississippi law[3]--controls the district court's inquiry except insofar as federal law supplements or preempts state law. *See id.* at 944-45; *Galey v. World Marketing Alliance*, 510 F.3d 529, 531 (5th Cir. 2007). Federal law, in turn, "creates a presumption that the parties did not agree to submit any question as to the arbitrator's own power to that very same arbitrator." *General Motors Corp. v. Pamela Equities Corp.*, 146 F.3d 242, 248 (5th Cir. 1998) (citing *First Options*, 514 U.S. at 944). According to the Supreme Court, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *Id.* at 944 (internal brackets omitted). "[A]ny silence, ambiguity or doubts about this question should be resolved in favor of concluding that the parties did not agree to submit the issue to the arbitrator." *General Motors Corp.,* 146 F.3d at 248.

Here, Bollinger argues that the contract contains "clear and unmistakable" evidence of an agreement to arbitrate arbitrability because it incorporates the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). The AAA's rules provide in relevant part:

The arbitrator shall have the power to rule on his or her

---

[3] The contract's general choice of law clause specifies that Mississippi law should govern the contract. (*See* R. Doc. 15-23 at 30.)

> own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

(*See* R. Doc. 32-5 at ¶ R-7.) Bollinger contends that "[b]ecause the AAA rules explicitly state that the arbitrator decides issues related to the existence[,] scope and validity of an arbitration agreement, a subcontract purporting to be governed by the AAA Commercial Rules is clearly and unmistakably [an] agreement to arbitrate arbitrability." (R. Doc. 32-2 at 11.)

All of the federal courts to have considered the issue have held that when a contract contains or incorporates this type of language, it clearly and unmistakably vests the arbitrator, and not the district court, with authority to decide which issues are subject to arbitration. *See Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (holding that when "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator"); *Terminix Int'l Co., L.P. v. Palmer Ranch L.P.*, 432 F.3d 1327 (11th Cir. 2005); *FSC Securities Corp. v. Freel*, 14 F.3d 1310 (8th Cir. 1994); *Apollo Computer, Inc. v. Berg*, 886 F.2d 469 (1st Cir. 1989); *Citifinancial, Inc. v. Newton*, 359 F. Supp. 2d 545, 551-52 (S.D. Miss. 2005); *Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*, 203 F.R.D. 677, 685 (S.D. Fla.

2001), *aff'd on other grounds*, 312 F.3d 1349 (11th Cir. 2002).[4]

NGSS attempts to distinguish these cases by arguing that they involved "broad" arbitration clauses that referred all contract-related disputes to arbitration. *See, e.g., Terminix Int'l. Co., LP*, 432 F.3d at 1329 (arbitration clauses covered "any controversy or claim ... arising out of or relating to" the agreement). In the present case, by contrast, the arbitration clause covers only a narrow subset of disputes, to wit, "claim[s] for additional costs associated with [the] late delivery of information of equipment by [NGSS], ICGS, or Lockheed Martin." (R. Doc. 15-22 at 4.) Moreover, NGSS points out, the contract incorporates dispute resolution provisions from the Contract Disputes Act and the Federal Acquisition Regulations, and contains a clause designating the U.S. District Court for the Southern District of Mississippi as the appropriate forum for hearing all of the other disputes. In light of the contract's inclusion of provisions for non-arbitral dispute resolution and the narrowness of the arbitration clause, NGSS concludes that the "reference to AAA rules ... does not constitute 'clear and unmistakable evidence' that the parties intended to arbitrate arbitrability ... ." (R. Doc. 49-1 at 16.)

---

[4] Bollinger also cites *P&P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861 (10th Cir. 1999), but that case involved the confirmation of an arbitral decision rather than the threshold question at issue here. *See* 179 F.3d at 866-68.

Were this question *res nova*, NGSS might have a better chance of success. But too many federal courts have adopted the contrary position for the Court to re-interpret the effect of incorporating the AAA rule without a more compelling basis for doing so. If, as the cases hold, reference to the AAA rules incorporates a provision "empower[ing] an arbitrator to decide issues of arbitrability," *Contec Corp.*, 398 F.3d at 208, it is difficult to see how an arbitration clause that does not specifically exclude the application of AAA Rule 7 can vitiate that power. There is a longstanding rule of statutory construction, *generalia specialibus non derogant*, instructing that a general law should not be read to derogate from a more specific law. *See Ex parte Crow Dog*, 109 U.S. 556, 570-71 (1883). The same principle applies in this case. The AAA rule, according to the overwhelming majority of federal courts, constitutes specific evidence that the parties intended to arbitrate arbitrability. That the arbitration clause specifies the types of disputes that are arbitrable does not compel the conclusion that the parties did not intend for the arbitrator to decide whether a particular dispute falls within the ambit of the disputes covered by the clause. NGSS has not explained how the two provisions can be harmonized to reach its preferred result without also rejecting the reasoning of the other federal courts to decide this issue or reading the incorporated provision out of

the contract.

Indeed, at times NGSS seems to suggest that the Court should simply ignore the AAA rule. The Court is not free to read out portions of the contract, however. *See Galey*, 510 F.3d at 532 ("[I]f a contract incorporates another document by reference, then both documents must be read together to give full effect to the intent of the parties."). NGSS also cites a case from the Supreme Court of Delaware that endorses the distinction between broad and narrow arbitration clauses. *See James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76 (Del. 2006). That court found that "the majority federal view that reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator" applies only in cases in which two conditions obtain: (1) "where the arbitration clause generally provides for arbitration of all disputes," and (2) where the clause "also incorporates a set of arbitration rules that empower arbitrators to decide arbitrability." *Id.* at 80. In justification of this modified reading of the "majority federal rule," the court simply notes that the arbitration clauses in the federal cases were of the broad type. *Id.* at 80 n.9. But pointing out a factual difference is not the same as establishing that the difference should have legal significance. This Court fails to see how the AAA rule has any meaning under the Delaware court's interpretation. Absent a more convincing explanation of

how NGSS's approach gives effect to the AAA rule, the Court sees no justification for breaking with the "majority federal rule."

For these reasons, Bollinger's Motion to Compel Arbitration should be granted and NGSS's Motion to Stay Arbitration should be denied. The Court will stay this action so that the parties may submit their dispute to arbitration. It will be for the arbitrator to determine the scope of the arbitration clause in the first instance. If he determines that the underlying dispute does not fall within the clause's ambit, as NGSS argues, then the parties may return to this Court for further proceedings.

## IV.  CONCLUSION

For the foregoing reasons, Bollinger's Motion to Compel Arbitration is GRANTED and NGSS's Motion to Stay Arbitration is DENIED. Further, NGSS's Motion to Dismiss Counts I-II of the Complaint and Motion to Dismiss Counts III-VIII of the Complaint are DENIED WITHOUT PREJUDICE to the right of NGSS to renew its arguments at a later date.

IT IS ORDERED that this action shall be stayed pending arbitration.

New Orleans, Louisiana, this 12th day of January, 2009.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE